NORMAN J. THOMPSON and GWENDOLYN THOMPSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thompson v. Commissioner
Docket No. 18895-81.
United States Tax Court
T.C. Memo 1984-337; 1984 Tax Ct. Memo LEXIS 337; 48 T.C.M. (CCH) 412; T.C.M. (RIA) 840337; July 2, 1984. *337 Held, advanced royalties paid in 1977 by petitioner, a cash basis taxpayer, were not deductible because no coal was ever produced in 1977 and the royalties were not paid pursuant to a valid minimum royalty provision as provided in section 1.612-3(b)(3), Income Tax Regs.
Norman J. Thompson and Gwendolyn Thompson, pro se. Daniel J. Wiles, for the respondent. STERRETT
MEMORANDUM OPINION STERRETT, Judge: By notice of deficiency dated April 15, 1981, respondent determined a deficiency of $9,070.56 in petitioner's Federal income tax for the taxable year 1977. This case is before the Court on respondent's Motion *338 for Summary Judgment filed on January 3, 1984, pursuant to Rule 121, Tax Court Rules of Practice and Procedure.[1] The sole issue for decision is whether petitioners may deduct in 1977 certain amounts allegedly paid for coal royalties in that year pursuant to a "Mining Lease." Petitioners Norman J. Thompson and his wife, Gwendolyn Thompson, resided in Oakland, California at the time of filing the petition herein. They filed a joint Federal income tax return for 1977 with the Office of the Internal Revenue Service at Philadelphia, Pennsylvania. On December 2, 1977, petitioner Norman J. Thompson (hereinafter all references to petitioner in the singular will be to Norman J. Thompson) entered into a "Mining Lease" with Wyoming and Western Coal Reserves, Inc. (hereinafter referred to as Wyoming & Western or WWCR). Under the terms of the lease, which was actually a sublease, petitioner was entitled to mine all of the "economically recoverable" coal contained in an undefined portion of real estate owned or leased by WWCR for a period of eight calendar years plus the balance of 1977. In consideration *339 for entering into the "Mining Lease," petitioner agreed to pay WWCR a $1,000 lease deposit along with royalties provided as follows: 6. Royalties. The Lessee shall pay as rental for said coal and mining rights and privileges hereby leased, a royalty of the greater of (i) 15% of the net pit price plus $ .50 per ton of 2,000 pounds of run-of-mine merchantable coal hereby leased or (ii) $3.00 per net ton of run-of-mine merchantable coal hereby leased and which is sold from said premises; provided, however, that Lessee shall pay as rental for said mining rights and privileges hereby leased, a royalty of $2.50 per net ton of the initial 36,000 tons sold or mined, removed and marketed. (a) Lessee will pay Lessor a minimum annual royalty payment of $22,500.00. The minimum royalty payment herein provided for shall be recoupable at the rate of $2.50 per ton of coal sold or mined, removed and marketed. One fourth of the minimum annual royalty payment for the first lease year is payable at the inception of this lease. The balance is payable on or before December 31, 1977. The next seven minimum annual royalty payments are payable on or before December 31, of the following seven years. *340 All royalty payments made to Lessor will have a cumulative effect with reference to the requirement of paying the minimum royalty payments. Therefore, any royalty paid by Lessee will be applied towards the annual minimum royalty payment requirement. Minimum royalties are nonrefundable. (b) In the event that the Lessee shall sell coal in place by way of a carved-out production payment or otherwise, Lessee will be obligated to pay Lessor a royalty payment to the same extent as if the coal had been mined, removed and marketed. Such royalties shall be due and payable within eighteen months of the date on which the contract creating the production payment is made. In addition to the "Mining Lease" executed by petitioner with WWCR, petitioner on the same day also entered into an "Addendum to Mining Lease" with WWCR. According to the addendum, the minimum annual payments provided for in the "Mining Lease" due on December 31, 1979 and thereafter could be paid by either "cash or note." Furthermore, if payment by note was desired then the addendum set forth the following required form for such note: $22,500.00
December 31, 1979 The undersigned promises to pay WYOMING AND WESTERN *341 COAL RESERVES, INC., TWENTY-TWO THOUSAND FIVE HUNDRED DOLLARS with interest at 6% per annum form [sic] date hereof. This is a non-recourse note. Payments to be made to payee from all coal mined, in excess of the initial 18,000 tons, on the basis of $3.00 per ton of coal sold or mined, removed and marketed from the Leased Premises. Total balance of principal and interest shall be due and payable on December 31, 1997. If said balance is not paid when due, Payee may retain note or cancel it and foreclose on that certain Coal Lease between Lessor and Lessee. Petitioner paid one-quarter ($5,625) of the 1977 "minimum annual royalty payment" with his own check dated "December 2, 1977." Petitioner then borrowed the remaining amount ($17,875) which included the lease deposit of $1,000 from Coal and Minerals Leasing and Development Corporation (hereinafter referred to as CM). The promissory note signed by petitioner provided in pertinent part as follows: NON-RECOURSE PROMISSORY NOTE For value received, the undersigned hereby promises to pay to Coal and Minerals Leasing and Development Corporation the sum of SEVENTEEN THOUSAND EIGHT HUNDRED SEVENTY-FIVE DOLLARS ($17,875.00) *342 on December 31, 1997, together with interest at the rate of 10% per annum, at 15250 Ventura Boulevard, Sherman Oaks, California, 91403, or at such other place as may be designated in writing by the payee. Should any further sums be lent to payor by payee during 1978, such sums shall be added to the principal then outstanding and shall be repaid under the terms of this note. This is a non-recourse note. Collateral is to be all coal leased to payee under the terms of his lease with Wyoming and Western Coal Reserves, Inc., in excess of 18,000 tons. Payment is to be made from all proceeds received by payor from the leased premises, at the rate of $2.00 per ton sold. In exchange for petitioner's non-recourse promissory note, CM issued a check to petitioner on December 7, 1977 in the amount of $17,875 which petitioner negotiated to WWCR pursuant to the following "Authorization to Negotiate" signed by petitioner: The undersigned hands you or causes you to be handed a check in the amount of $17,875.00, payable to the undersigned and drawn by Coal and Minerals Leasing and Development Corporation. You are hereby authorized to endorse said check on behalf of the undersigned, provided *343 said check is delivered to Wyoming and Western Coal Reserves, Inc., as payment for royalties due under the terms of a mining lease between the undersigned and Wyoming and Western Coal Reserves, Inc. You are further authorized to endorse and deliver to Wyoming and Western Coal Reserves, Inc., any other checks that the undersigned causes to be delivered to you by Coal and Minerals Leasing and Development Corporation and made payable to the undersigned. Petitioner also entered into a "Contract for the Sale of Coal" with CM under which he agreed to sell 18,000 tons of economically recoverable coal reserves to CM for a total purchase price of $63,000 or $3.50 per ton. According to the contract, this sale constituted the creation of a "carved out production payment." Payment under the contract was to be made on December 31, 1987; however, CM was granted the right to extend this payment date until December 31, 1997, upon notice in writing to petitioner and upon the understanding to pay 10 percent per annum on the principal balance. Furthermore, prior to the original due date of December 31, 1987, payments of principal and interest were to be made exclusively from receipts of coal mined, *344 removed and marketed. The contract also provided: 3. As additional inducement for the Seller's entering into this contract, Buyer hereby agrees to lend Seller $17,875.00 to be repaid under the terms of the non-recourse promissory note attached hereto as Exhibit B, and further agrees to lend another $16,875.00 to Seller in 1978. 4. Buyer is entitled to the net proceeds from the initial 18,000 tons of coal mined from the Leased Premises. 5. Buyer agrees to commence mining as soon as practicable. All of the transaction documents executed by petitioner including the "Mining Lease," the "Addendum to Mining Lease," the "Non-Recourse Promissory Note," the "Authorization to Negotiate" and the "Contract for the Sale of Coal" were part of a preprinted promotion package published on behalf of WWCR. No coal was mined or sold on the property leased by petitioner during the year 1977. On their Federal income tax return for 1977, petitioners attached a Schedule C for Norman Thompson's coal mining business. On this Schedule C, petitioners indicated that the coal mining business was being conducted on the cash method of accounting. Petitioners claimed a deduction of $22,500 for 1977 *345 as a minimum royalty with respect to the WWCR lease. In his notice of deficiency, respondent disallowed petitioner's claimed coal mining deduction in full for the following stated reasons: With respect to the above partnership, your claimed distributive share of losses and credits is disallowed because you have not established the amount and character of such losses and credits, including but not limited to your failure to establish: (1) that the alleged events, transactions and expenditures ever occurred in fact or in substance, (2) that the venture was a trade or business, (3) that the underlying events and transactions arose in a trade or business, (4) that such amounts identify with royalties which were paid or accrued pursuant to a written agreement or a lease that was binding prior to October 29, 1976, (5) that you were a partner in the above partnership on or before October 29, 1976, (6) that the claimed losses and credits were not in excess of your adjusted basis, and (7) that any nonrecourse financing should be considered in determining your adjusted basis in the partnership or in determining the adjusted basis of the partnership's assets. Rule 121(b) provides *346 that a decision may be entered upon motion for summary judgment if it is shown "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." The only issue raised by respondent in his Motion is whether or not the royalty payments made by petitioner are deductible under the guide-lines set forth in section 1.612-3(b)(3), Income Tax Regs.[2] That section states in relevant part-- The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accured, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section *347 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease. * * * [Emphasis added.] Under the regulation, if no mineral product is produced during a given year, then no royalty deductions are allowed in that year unless royalties are paid or accrued as a result of a provision in the lease requiring that substantially uniform royalties be paid each year of the lease. In the instant case, no coal was mined or sold on the property leased by *348 petitioner during the year 1977. Thus, in order for the royalty payment of $22,500 paid by petitioner to be deductible in 1977, the payment must have been made pursuant to a valid minimum royalty provision. Respondent argues that, because petitioner was not required to make annual royalty payments in the absence of mineral production, the payment by petitioner does not satisfy the requirements set forth in section 1.612-3(b)(3), Income Tax Regs. In support of his position, respondent relies on the "Addendum to Mining Lease" which allows petitioner to make future annual royalty payments by the execution of a nonrecourse note. Under the terms of such nonrecourse note, payment would only be made from all coal mined in excess of the initial 18,000 tons. We previously addressed the question of whether a nonrecourse note could constitute payment for purposes of a minimum royalty provision under section 1.612-3(b)(3), Income Tax Regs., in the case of Wing v. Commissioner,81 T.C. 17 (1983). In that case, the taxpayer was obligated to pay an advance minimum annual royalty of $60,000--$6,000 a year over a 10-year period. The taxpayer satisfied this obligation upon execution *349 of the agreement by transferring $10,000 cash and a nonrecourse promissory note in the amount of $50,000 payable in 10 years. The taxpayer argued in Wing that, because the minimum royalty was paid by a note collateralized by sufficient reserves, the fact that it would be paid at some point by cash or foreclosure of the lease was sufficient to constitute a valid "minimum royalty provision" under section 1.612-3(b)(3), Income Tax Regs. The Government, however, asserted that the provision at issue did not constitute a valid "minimum royalty provision" because, instead of requiring payment each year, it allowed the taxpayer to defer payment of $50,000 of the royalty for some 10 years through the execution of a 10-year nonrecourse note. In adopting the Government's position that the provision in question did not constitute a valid "minimum royalty provision" we stated: To qualify for the deduction, the petitioner must meet the terms of the regulation, which sets out that a minimum royalty provision must require payment at least annually. That the note may in fact be paid at some later date is not sufficient to establish the existence of such a requirement. [81 T.C. at 40-41.]
*350 The logic behind our holding in Wing is clearly applicable to the instant case. The "Addendum to Mining Lease" executed by the parties authorized the payment of all future annual minimum royalties for 1979 and subsequent years by means of nonrecourse notes due on December 31, 1997 with payment required only when coal in excess of the initial 18,000 tons was produced. Thus, regardless of the likelihood of the eventual satisfaction of such notes, the "Addendum to Mining Lease" permitted deferral of the minimum annual royalties provided for in the "Mining Lease" for the years 1979 and thereafter so that payment was not required to be made at least annually. Consequently, the $22,500 payment made by petitioner in 1977 was not made pursuant to a valid "minimum royalty provision" in accordance with section 1.612-3(b)(3), Income Tax Regs.
In conclusion, since no coal as produced in 1977 and the royalty payment made by petitioner in 1977 was not made pursuant to a minimum royalty provision, respondent is entitled to prevail on this issue as a matter of law. Accordingly, respondent's Motion for Summary Judgment will be granted. An appropriate order and decision will be entered. *351 Footnotes
1. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent concedes for the purpose of this Motion that the money borrowed from CM was pursuant to a bona fide transaction and, further, that the borrowed funds were paid to WWCR.↩